**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
_____

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                     **MEMORANDUM OF LAW & ORDER**
                                     Criminal File No. 04-313 (MJD/FLN)

(1) LARRY DARNELL WILLIAMS,

        Defendant.
_____

Erica MacDonald and Chris Wilton, Assistant United States Attorneys, Counsel for Plaintiff.

Andrea K. George, Office of the Federal Defender, Counsel for Defendant Larry Darnell Williams.
_____

## I.   INTRODUCTION

      This matter is before the Court on Defendant Larry Darnell Williams'

Motion for Acquittal Notwithstanding the Verdict [Docket No. 123], Motion to

Dismiss for Ineffective Assistance of Counsel [Docket No. 124], and Motion for

New Trial [Docket No. 126].

## II.   FACTUAL BACKGROUND

### A.   The Indictments

After Williams was originally indicted in July 2004, he was represented by

1

CJA panel counsel Lee Johnson.  The original Indictment charged Williams with Count 1, possession with intent to distribute crack, Count 2, possession of a firearm during a drug trafficking crime, and Count 3, felon in possession of a firearm, all occurring on January 17, 2004.  When Williams retained Calandra Harris in October 2004, Johnson had already attended a pretrial motion hearing on the original Indictment.

The Government filed a Superseding Indictment against Williams on December 21, 2004, adding a count for drug trafficking conspiracy, a count for possession of a firearm during a drug trafficking crime, and a count for felon in possession of a firearm, all related to Williams' arrest in July 2004.

In the Second Superseding Indictment, filed February 15, 2005, the Government added a crack possession charge related to May 19, 2004.  In the Second Superseding Indictment, Williams was charged with: Count 1, drug trafficking conspiracy to distribute and to possess with intent to distribute a mixture or substance containing a detectable amount of cocaine base "crack," from January 2004 to July 15, 2004; Count 2, possession with intent to distribute a mixture or substance containing a detectable amount of cocaine base "crack," on January 17, 2004; Count 3, possession with intent to distribute a mixture or substance containing a detectable amount of cocaine base "crack," on May 19, 2004; Count 4, possession of a firearm during a drug trafficking crime, on January

17, 2004; Count 5, felon in possession of a firearm, on January 17, 2004; Count 6, possession of a firearm during a drug trafficking crime from March 2004 to July 15, 2004; and Count 7, felon in possession of a firearm from March 2004 to July 15, 2004.  On March 10, 2005, the Court granted the Government's motion to dismiss Counts 4 and 5 - the gun charges related to Williams' January 17, 2004 arrest.  Counts 6 and 7 became new Counts 4 and 5 - gun charges relating to the time period March 2004 to July 15, 2004.  Williams' trial was scheduled to begin on March 10, 2005.

### B.      Possible Conflict of Interest Related to Nunziata Williams

On March 8, 2005, the Government filed a Notice of Possible Issue of Successive Representation.  [Docket No. 113]  The Government had learned that Harris had contact with Nunziata Williams, one of the Government witnesses for Williams' upcoming trial.  It asserted that Harris had represented Larry Williams in connection with a robbery, for which both Larry Williams and Nunziata Williams were arrested.  At Larry Williams' direction, Harris had visited Nunziata Williams while she was in jail.  The Government further alleged that Nunziata Williams also sought Harris's advice on a family law matter, but never retained Harris.

The Court ordered a hearing on March 10 to address the conflict of interest issue.  At the hearing, Harris testified under oath that she had never had an attorney-client relationship with Nunziata Williams, that her ability to

cross-examine Nunziata Williams would not be affected by her prior contacts with her, and that her brief prior contacts with Nunziata Williams were unrelated to any issues in this case.  The Court concluded that the possibility of a conflict was remote.  [Docket No. 117]  Out of an abundance of caution, the Court informed Williams that, although a conflict was unlikely to arise, he had the option to continue the trial and obtain new counsel.  Williams clearly indicated his desire to continue with Harris's representation.  The Court concluded that he gave a knowing and intelligent waiver of any potential conflict of interest that Harris may have had as a result of her prior contact with Nunziata Williams and permitted Harris to continue in her representation of Larry Williams.

### C.    Williams' Discharge of Harris

Larry Williams' trial commenced on March 10, 2005.  On March 14, Williams moved to discharge Harris and to represent himself for the remainder of the trial.  The Court conducted a hearing on the issue of self-representation and granted a recess to allow Williams to further discuss the issue with Harris.  After the recess, Williams again asserted his desire to proceed pro se.  The Court granted Williams' motion, concluding that he had voluntarily and intelligently decided to exercise his right to self-representation.  [Docket No. 121]  The Court ordered Harris to continue as standby counsel for Williams.

The following morning, March 15, Williams requested that Harris give a

4

closing argument on his behalf to the jury.  After a prolonged colloquy with Williams, the Court ordered Harris to give the closing argument.

On March 16, the jury found Williams guilty of Counts 1, 2, 3, and 5.  The jury found Williams not guilty of Count 4.  [Docket No 136]  On March 23, Williams filed the current pro se post-trial motions.

On October 25, 2005, the Court appointed Federal Public Defender Andrea George to represent Williams and assist him with his pro se post-trial motions. Since Williams originally filed his post-trial motions, the Court has received extensive supplemental briefing and, after multiple continuances, the Court held an in-depth evidentiary hearing on Williams' allegations.  At this point, the record before the Court is complete and all legal issues have been fully argued.

## III.   DISCUSSION

### A.   Motion for Acquittal Notwithstanding the Verdict

When deciding a motion for acquittal, the Court views the evidence and all reasonable inferences from it in the light most favorable to the verdict.  United States v. Hood, 51 F.3d 128, 129 (8th Cir. 1995).  If there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt, that verdict must be upheld.  Id.  Based on its review of the evidence submitted at trial, the Court concludes that there is sufficient evidence for a reasonable jury to find, beyond a reasonable doubt, the existence of

the essential elements of Counts 1, 2, 3, and 5 of the Second Superceding

Indictment.  Williams' Motion for Acquittal is denied.

### B.      Motion to Dismiss for Ineffective Assistance of Counsel

Williams moves to dismiss the Second Superceding Indictment on the

grounds that his counsel's assistance was ineffective.  As explained in Part III(C),

the Court has determined that Williams' Sixth Amendment right to effective

assistance of counsel was not violated.  Additionally, alleged deficiencies by

Williams' private counsel, without the allegation of any irregularity by a

Government actor, are not an appropriate impetus to dismiss the indictment

against Williams.  See United States v. Williams, 372 F.3d 96, 111 (2d Cir. 2004)

(noting that dismissal of the indictment is appropriate when "the government

violates a protected right of the defendant and (2) the government's conduct is

sufficiently outrageous").  Williams' Motion to Dismiss is denied.

### C.      Motion for New Trial

#### 1.      Standard

Under Rule 33 of the Federal Rules of Criminal Procedure, the Court may

vacate any judgment and grant a new trial if the interest of justice so requires.

The decision of whether to grant a new trial is within the broad discretion of the

district court.  United States v. Dodd, 391 F.3d 930, 934 (8th Cir. 2004).

Williams asserts that he is entitled to a new trial based on ineffective

6

assistance of counsel.  In order to gain relief, Williams must establish both that his counsel's performance "fell below an objective standard of reasonableness," and that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 688, 692 (1984).  The burden is on Williams to establish a "reasonable probability that, but for counsel's unprofessional errors, the result would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

Counsel's performance is deficient if it falls outside of the "wide range of reasonable professional assistance," although there is a strong presumption that counsel's conduct falls within this broad spectrum.  Strickland, 466 U.S. at 689. "Counsel's performance is deficient when it is less competent than the assistance that should be provided by a reasonable attorney under the same circumstances." Chambers v. Armontrout, 907 F.2d 825, 828 (8th Cir. 1990) (citing Strickland, 466 U.S. at 687).  Attorney decisions are presumed to be reasonable, and "strategic choices made after thorough investigation of the law and facts . . . are virtually unchallengeable."  Simmons v. Iowa, 28 F.3d 1478, 1481 (8th Cir. 1994) (quoting Strickland, 466 U.S. at 690).

### 2.   Overall Allegations of Ineffective Assistance

Williams asserts that Harris's performance was deficient in a number of ways.  Although many of Williams' allegations of specific instances of ineffective

assistance of counsel are contained in his Motion to Dismiss, the Court will

address all of Williams' allegations from both the Motion to Dismiss and the

Motion for a New Trial when deciding his Rule 33 motion.  Bracken v. Dormire,

247 F.3d 699, 703 (8th Cir. 2001) (noting that courts should broadly interpret pro

se filings).  Additionally, Williams asserted additional grounds for ineffective

assistance of counsel after the Court appointed new defense counsel in October

2005.

The Court has reviewed each accusation and concludes that, even in

totality, they are insufficient to warrant grant of a new trial.  Williams fails to

allege that many of Harris's alleged errors resulted in prejudice.  However, even if

Williams had alleged prejudice, the Court concludes that, in light of the

overwhelming evidence against Williams, he cannot establish a reasonable

probability that, but for Harris's actions, the outcome of his trial would have been

different.  The Court now addresses each allegation in turn.

### 3.    Conflict of Interest Regarding Nunziata Williams

Williams claims that Harris was burdened by an actual conflict of interest

due to her relationship with Government witness Nunziata Williams.  "A criminal

defendant's right to effective assistance of counsel includes the right to be

represented by counsel free of conflict."  Gumangan v. United States, 254 F.3d

701, 705 (8th Cir. 2001) (citation omitted).   A defendant can knowingly,

voluntarily, and intelligently waive the right to the assistance of an attorney unhindered by a conflict of interest. Id. at 705-06. Prejudice will be presumed when the defendant's counsel "actively represented conflicting interests and . . . an actual conflict of interest adversely affected his lawyer's performance." Strickland, 466 U.S. at 692 (citation omitted). "The mere fact that a trial lawyer had previously represented a prosecution witness does not entitle a defendant to relief. The defendant must show that this successive representation had some actual and demonstrable adverse effect on the case, not merely an abstract or theoretical one." United States v. Flynn, 87 F.3d 996, 1001 (8th Cir. 1996) (citations omitted).

The Court conducted a pretrial hearing on the conflict of interest issue, during which Williams was informed of his rights and offered the opportunity to obtain new counsel. Williams voluntarily gave a knowing and intelligent waiver of any potential conflict of interest that Harris may have had as a result of her prior contact with Nunziata Williams. Williams' request for a new trial based on Harris's previous relationship with Nunziata Williams is denied.

### 4. Pretrial Custody

Although Williams alleges that Harris failed to obtain a renewed pretrial release hearing on his behalf, he offers no evidence that this action affected the outcome of his trial or that, if she had obtained a hearing on this issue, there was

a reasonable probability that the Court would have granted pretrial release.  The

original Detention Order demonstrates that Williams presented a risk of danger to

the community, having at least two prior convictions for crimes of violence and a

drug crime, and a great risk of nonappearance, having a recent prior conviction

for fleeing from the police and facing a substantial time of imprisonment if

convicted of the alleged offenses.  [Docket No. 21]

### 5.    Williams' Trial Clothing

Williams claims that Harris failed to provide him with civilian clothing for

trial, forcing him to wear his prison uniform throughout trial.  Before the start of

trial, the Court offered Williams the option to wear civilian clothing from the

Federal Public Defenders' office or the clothes that Williams was wearing when he

was arrested.  Despite the Court's advice that he change out of his prison uniform,

Williams refused.  Any prejudice to Williams resulting from wearing his prison

uniform throughout trial is attributable to Williams' own refusal to change his

clothing, not to any actions by Harris.

### 6.    Quality of Relationship Between Williams and Harris

Williams makes a series of allegations related to his relationship with Harris

both before and during trial.

### a.    Pretrial Allegations

### i.    Communication Regarding Plea Offer

According to Williams, Harris informed him of the Government's plea offer against his wishes; he asserts that he had already informed her that he would not accept a plea.  Failure to inform a defendant of a plea offer may constitute unreasonable performance.  United States v. Blaylock, 20 F.3d 1458, 1465-66 (9th Cir. 1994).  In telling Williams of the plea offer, Harris was fulfilling her duties as effective counsel.  Her actions were not deficient.

### ii.    Alleged Breakdown in Communication

Williams also raises the argument that Harris was ineffective due to her failure to sufficiently communicate with him.  Williams asserts that Harris did not take his calls for up to two weeks at a time.  He claims that during their conversations, Harris would not discuss the issues that he wanted to discuss.  Additionally, he alleges that Harris's co-counsel attended Williams' February 7, 2005, hearing in Harris's place, attempted to discuss her fee, and falsely stated that she would visit him in jail even if it were after 10:00 p.m.  Williams also objects to the tone of a letter from Harris informing him that the Government had filed a superseding indictment against him.  Finally, he objects overall that Harris's communications with him were too infrequent, both in-person and over the telephone.

According to the log at the Sherburne County Jail, between October 1, 2004, and October 31, 2005, Harris visited Williams at the Sherburne County Jail

four times.  Harris became counsel of record on October 19, 2004.  [Docket No.

36]  She visited Williams at the Sherburne County Jail twice on October 5, 2004;

once on October 28, 2004; and once on December 12, 2004.

Williams also submits telephone records of his calls from the Sherburne

County Jail to Harris's cellular and office telephones.  He points out that between

August 2004 and March 2005 there were thirteen telephone calls longer than five

minutes.  In total, Harris spoke with Williams by telephone for approximately six

and one-half hours.  She did not speak to Williams by telephone or at the jail after

February 15, 2005, until March 21, 2005.

While Williams' math is correct, according to the telephone records,

Williams and Harris were in constant contact, often speaking multiple times in one

day.  However, many of these telephone calls lasted for periods of time shorter

than five minutes.  Williams is also correct that the visitor and call logs show no

contact after February 15 and before March 21, 2005.  However, Harris did meet

Williams in person on for arraignment, on February 28, 2005, and during trial,

which started on March 10, 2005.

While Harris's communication with Williams may not have been optimal, it

was sufficient.  They were in frequent contact, though brief telephone

conversations, until the last few weeks before trial.  In any case, Williams is unable

to show prejudice.  See Lenz v. Washington, 444 F.3d 295, 303 (4th Cir. 2006)

("Even if his attorneys' infrequent visits somehow rendered their performance 'deficient,' petitioner has not properly alleged that he was prejudiced by this deficiency. . . . [H]e has provided 'no explanation how additional meetings with his counsel, or longer meetings with his counsel, would have led to new or better theories of advocacy or otherwise would have created a 'reasonable probability' of a different outcome.' '[T]he mere fact that counsel spent little time with [petitioner] is not enough under <u>Strickland</u>, without evidence of prejudice or other defects.") (quoting <u>Hill v. Mitchell</u>, 400 F.3d 308, 325 (6th Cir. 2005); <u>Bowling v. Parker</u>, 344 F.3d 487, 506 (6th Cir. 2003)).

Although a complete breakdown in communication between counsel and client may give rise to a presumption of ineffectiveness, <u>United States v. Soto Hernandez</u>, 849 F.2d 1325, 1328 (10th Cir. 1988), Williams' allegations do not rise to that level.  Harris vigorously presented Williams' defense, filing pretrial motions, presenting a strong opening statement on Williams' behalf, making appropriate objections and cross-examining witnesses until Williams discharged her, and presenting a strong closing argument as standby counsel.  "It is well-established that the Sixth Amendment does not require an attorney and a client to have a meaningful attorney-client relationship or good rapport." <u>United States v. Golden</u>, 102 F.3d 936, 942 (7th Cir. 1996) (citation omitted).  "The sixth amendment requires the court to satisfy itself that the defendant is adequately

represented, not to speculate on the complex emotional relationship of a client and h[is] lawyer." Id. (citation omitted).  The communication difficulties and disagreements between Harris and Williams outlined above are insufficient to demonstrate ineffective assistance of counsel.

The Court observed Harris's performance in this case and concludes that her representation of Williams was able and professional.  Moreover, Williams does not allege that these alleged failures of communication resulted in prejudice. Additionally, on March 10, during the conflict of interest hearing, Williams explicitly informed the Court that he wished to continue with Harris's representation.  Williams' stated desire to continue with Harris's representation is inconsistent with his claim that her pretrial actions led to a complete breakdown in communication.

### b.    Relationship During Trial

Williams also raises allegations regarding of his relationship with Harris during the trial, claiming that she was angry and hostile.  He has submitted copies of notes exchanged between Harris and Williams.  The notes appear to relate to Harris's and Williams' comments on particular witnesses and evidence presented during trial, as well as Williams' questions and comments on evidentiary rules and procedure.  The notes are undated and out of context.  It appears that Williams was displeased with Harris's failure to ask particular questions of particular

witnesses.  These notes do not demonstrate that Harris's performance was

deficient.  Trial strategy decisions, such as deciding which questions to ask a

particular witness or which evidence to introduce, are "virtually unchallengeable."

<u>Bowman v. Gammon</u>, 85 F.3d 1339, 1345 (8th Cir. 1996).  Additionally, Williams

does not allege any particular prejudice.

Williams further asserts that Harris failed to disclose evidence in a timely

manner to Warren "Pat" Robinson, a private investigator hired by Williams' family.

Specifically, Williams claims that, during trial, when the Government provided

Harris a disk of a recorded telephone conversation between Defendant Williams

and Nunziata Williams, she gave Robinson a disk with no data.  Williams claims

that this "[n]ondisclosure was so serious that there is a reasonable probability that

the evidence would have produced a different verdict."  This broad statement is

insufficient to show prejudice.  Williams does not mention the contents of the

telephone conversation or how revelation of that information to Robinson could

have led to a different verdict.  Additionally, during the October 21, 2005,

evidentiary hearing before the Court, Robinson testified that Harris did give him

the disk containing the correct recording, but that he had not been able to figure

out how to play the disk with the correct program until after trial.  The Court

finds that Harris did give the correct disk to Robinson in a timely manner.

Williams complains that Harris refused to give a closing argument on his

behalf until ordered to so by the Court.  Williams discharged Harris as his attorney prior to closing arguments and stated his intent to proceed pro se.  Because Williams was representing himself, Harris had no obligation to prepare his closing argument for him.  In any case, once ordered to do so by the Court, Harris complied and presented a closing argument that was professional and competent.

Williams' allegations regarding his relationship with Harris during trial do not rise to the level of a complete breakdown in communication between counsel and client.  See United States v. Soto Hernandez, 849 F.2d 1325, 1328 (10th Cir. 1988).  Even if Williams and Harris did not have a good rapport, the Court concludes that Harris's performance was objectively competent.  Having observed both Harris and Williams throughout the trial, the Court concludes that the differences that arose between Williams and Harris were likely to have arisen with any attorney.  Moreover, Williams does not allege that Harris's actions resulted in specific prejudice.

### 7.    Harris's Trial Preparation

### a.    General Pro Se Allegations

In his pro se filings, Williams makes a series of allegations that Harris failed to reasonably prepare for trial and investigate, failing to seek out witnesses before and during trial, that she told Williams "her intent to withhold evidence in the defendant's case," and that Harris failed to obtain "paperwork" from Williams'

prior counsel.  These "vague and conclusory" allegations are insufficient to

demonstrate deficient performance.  <u>United States v. Robinson</u>, 64 F.3d 403, 405

(8th Cir. 1995).  Additionally, Williams alleges no particular prejudice from

Harris's action.

In supplemental filings, made after the Court appointed counsel for

Williams, Williams alleges specific allegations regarding Harris's trial preparation.

### b.    Specific Allegations Regarding Failure to Interview Witnesses

### i.    Standard

Harris did not interview any witnesses for Williams' trial.

[T]he decision to interview a potential witness is not a decision
related to trial strategy.  Rather, it is a decision related to adequate
preparation for trial.  Reasonable performance of counsel includes an
adequate investigation of the facts of the case, consideration of viable
theories, and development of evidence to support those theories.
Counsel has a duty . . . to investigate all witnesses who allegedly
possessed knowledge concerning [the defendant's] guilt or
innocence.  . . . [I]t is the duty of the lawyer to conduct a prompt
investigation of the circumstances of the case and explore all avenues
leading to facts relevant to guilt and degree of guilt or penalty.

<u>Henderson v. Sargent</u>, 926 F.2d 706, 711 (8th Cir. 1991) (citations omitted).

However, there is "no per se rule that failure to interview witnesses constitutes

ineffective assistance of counsel."  <u>Sanders v. Trickey</u>, 875 F.2d 205, 209 (8th Cir.

1989).

Whether Harris's decision not to interview a particular witness was

reasonable depends, in part, on the Court's finding of what Williams told Harris. "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."  Strickland v. Washington, 466 U.S. 668, 691 (1984) (citation omitted).  See also Cooley v. Nix, 738 F.2d 345, 347 (8th Cir. 1984) (holding that counsel was not ineffective for failing to interview potential alibi witness when defendant admitted he was not with that witness at the time of the crime).

Harris testified that, during a recorded telephone conversation, Williams admitted to her that he possessed the drugs found on him on January 17, 2004, Count 2.  In the transcript of that conversation, Williams states, "And like I said for one – I [indistinguishable] – only a 1.9 – it wasn't even 2 grams.  You know what I'm sayin'?"  (Def. Ex. 2 at 5.)  Harris also testified that Williams called her the night that the Riviera was repossessed from Club Cristal and told her that he was worried because he had left a gun with his fingerprints on it in the Riviera.  Thus, he admitted Count 5 of the indictment, felon in possession of a firearm, to Harris, as well.

Harris also testified that Williams did not provide her with any potential witnesses for the charges on which he was being tried.  Based on her knowledge of the case and her conversations with Williams, Harris determined that the way to defend the case was to argue that the Government was not going to prove its case beyond a reasonable doubt.

The Court now turns to Williams' allegations regarding specific witnesses.

### ii.      Quinn Tucker

### aa.     Pretrial Facts

At trial, three Minneapolis police officers testified that in the early morning of January 17, 2004, they heard gunshots and went towards a parking lot on Hennepin Avenue.  Once the officers arrived, they saw a maroon vehicle attempting to exit the parking lot entrance with its lights off.  Over the radio, an officer referred to the car as a possible suspect vehicle.  The driver was Larry Williams.

Officers Lazarchic, Wilson, and Kipke pulled Williams out of his car.  The officers brought Williams down with a knee strike, handcuffed him, and pat searched his outer clothing.  Lazarchic testified that he did not search Williams' pockets or inside of his clothing.  The police found a gun in or near Williams' car, but charges related to the gun were dismissed before trial.

Officer Hubin arrived and the officers told him that they had searched

Williams.  He assumed that they had conducted a thorough search.  Hubin

transported Williams to the Hennepin County Jail.  When another officer searched

Williams during booking, he found a baggy filled with five suspected crack rocks,

each individually wrapped in plastic, in Williams' pocket.

At the evidentiary hearing, Harris testified that during her trial preparation,

another client of hers, Quinn Tucker unexpectedly told her that he had shot off

the gun in the parking lot that night.  She also testified that she did not attempt to

elicit information from him about Larry Williams' case.  She did not hire an

investigator to obtain a statement from Tucker, nor did she seek funds from the

Court to hire an investigator to question him.  She did not inform the Court that

Tucker, an individual that she represented, was present at the scene that night

and was the one who shot the gun.  Nor did she cross-examine the police officers

regarding who fired the gun that night.  Harris testified that there were two guns

in the parking lot, and Williams told her that Tucker was not near him in the

parking lot, where the gun originally attributed to Williams was found.

Williams asserts that a false impression that he shot the gun that night was

created both by the police officers' testimony and by the testimony of the

Government's drug expert, Agent Bolger, that drug dealers often carry guns to

protect themselves from being robbed and often carry guns in their cars.  Williams

asserts that this left the jury with the impression that Williams, who was a suspect

in the gun shooting, was most likely a drug dealer protecting his drugs.

A recorded telephone conversation between Harris and Larry Williams on December 10, 2004, recounts their discussion of Quinn Tucker.  In that conversation Williams asked Harris if she talked to Tucker.  She said that she had and that "he said that, you know, he'll still help you out. . . .  [H]e said whatever I need, just call him."  Williams asks, "You know he's one of my witnesses as well, right?"  Harris responds, "Yeah.  Yep.  Oh he talked to me about it."  She then says, "Yeah, he talked to me about it.  'Cause he's the one that did it."  (Def. Ex. 2 at 5-6.)

### bb.    Trial Facts

Larry Williams' trial commenced on March 10.  Before trial commenced, the gun charges related to Williams' January 17, 2004, arrest were dismissed.

After the jury was chosen, Harris told the Court that there were issues that she wanted to put on the record.  The first issue was related to the defense witnesses.  She stated:

> My client did tell me today that there are some prospective witnesses he would like to call.  I told him that it's not possible, as we have already told these prospective jurors who will be potentially called as a witness.  Three of the witnesses that he did want to be called are already on the Government's witness list.  But he did want me to address that issue, that his attorney will not be calling some other prospective witnesses that he chose.  I do not know the substance of what they would offer, your Honor, and, at this point, I don't believe that it would be effective.

(Trial Tr. at 39.)  After a recess, the Court took up this issue again.  Based on

Harris's representations that she did not receive a witness list from Williams before

the day of trial; that Quinn Tucker's testimony would not be beneficial; that

Tucker was her client and there would be a potential conflict; and that Tucker's

name was just given to her an hour earlier, the Court held that Williams could not

call Tucker as a witness.

### cc.    Deficiency of Harris's Performance

Tucker was Harris's client.  Thus, Williams asserts that she was working

under a conflict of interest.  "Defense counsel have an ethical obligation to avoid

conflicting representations and to advise the court promptly when a conflict of

interest arises during the course of trial."  Cuyler v. Sullivan, 446 U.S. 335, 346

(1980) (footnote omitted).

There was no need for Harris to "interview" Tucker because, from a

conversation that she had with him, she knew the substance of what he had to

offer.  Counsel has a "duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary," Strickland,

466 U.S. at 691.  However, counsel's decision not to interview witnesses is

reasonable when "counsel testified that he knew these witnesses and the

substance of their potential trial testimony . . . [and] [c]ounsel's decision not to

call them was based upon his perception that their testimony would not be

believed and would be inconsistent with his own trial strategy." <u>Wing v. Sargent</u>,

940 F.2d 1189, 1191 (8th Cir. 1991).  While Harris did not formally interview

Tucker, she spoke with him informally and knew the substance of what he had to

offer.  She testified that, in her professional opinion, "what he had to offer was not

exculpatory" and "would not have helped Larry Williams in any way."  (Apr. 25,

2006 Tr. at 201, 206.)

Williams had already admitted to her that he possessed the drugs found on

him on January 17, 2004.  Additionally, the gun charge related to the January 17,

2004, incident was dismissed before trial.

### dd. Prejudice from Failure to Interview Tucker

Williams asserts that the failure to call Tucker as a witness was prejudicial

because it left the impression that Williams shot the gun on January 17, 2004,

when, he asserts, Tucker shot a gun.  At trial there was no gun charge related to

that date.  Williams asserts that an effective attorney would have called Tucker as

a witness, would have obtained a statement from Tucker to impeach him had his

testimony been adverse, and would have obtained information to corroborate his

account.

The Court concludes that Williams has failed to show prejudice.  At the

evidentiary hearing, Tucker testified that he had no relevant testimony related to

Williams' case.  He testified that he was not present when Williams was arrested

23

and searched on January 17, 2004, and knew nothing about the crack found on Williams (Count 2); he knew nothing about and was not present during Williams' arrest on May 19, 2004 (Count 3); and he knew nothing about the gun found in Williams' car in July 2004 and was not present at Club Cristal during that time (Counts 4 and 5).

Even if Tucker had testified at trial, Williams has failed to prove what his testimony would have been. See Freeman v. Graves, 317 F.3d 898, 901 (8th Cir. 2003) (holding that "[b]ecause [defendant] did not present the testimony of the alibi witnesses in the state postconviction proceeding, he cannot show actual prejudice under Strickland"). Tucker was a witness at the evidentiary hearing, and Williams' current counsel cross-examined him. It was never elicited that Tucker would have testified that he had shot a gun that night. (The Court notes that Tucker had a Fifth Amendment privilege to not testify regarding any possession of a gun by him because he is a convicted felon.)

The only matter to which Tucker might have testified - who fired the shots on January 17, 2004 - is irrelevant. The fact that shots were fired was relevant and admissible as part of the testimony regarding the context of the officers' investigation, but the identity of the shooter was not relevant. Based on the events of January 17, 2004, Williams was only charged with possession of crack cocaine found in his pocket while being booked, and Tucker had no relevant

24

admissible evidence to offer regarding that charge.  Furthermore, there was no

evidence at trial that Williams fired the shots.  The undisputed evidence at trial

was that no gun was found on Williams that night.

Williams also argues that Harris should have moved to exclude the evidence

of shots being fired because it was merely offered to show propensity and not for

any legitimate purpose.  See Fed. R. Evid. 404(b).  He claims that the evidence

was inadmissible under Federal Rule of Evidence 403 because the prejudicial

effect of the evidence substantially outweighed its probative value.  Evidence of

the shots fired was not offered as 404(b) evidence, but to give the context of why

the officers arrived at the scene.  The Court rejects Defendant's argument.

### ee.    Conflict of Interest Allegation Regarding Tucker

Williams also claims that his attorney labored under a conflict of interest

that prevented him from calling Quinn Tucker as a defense witness because

Tucker was Harris's client at the time of Williams' trial.  This issue was addressed

during trial.  Harris represented to the Court that Tucker's testimony would not be

beneficial to Williams.  Williams gave no indication of the substance of Tucker's

potential testimony and did not inform Harris of his desire to call Tucker until

after the start of trial.  Additionally, Williams did not raise this alleged conflict of

interest issue during the conflict of interest hearing that the Court held before the

start of trial that morning.  As the Court has concluded, Tucker had no relevant

testimony to offer. The Court concludes that Harris's relationship with Tucker did not adversely impact her representation of Williams.

### iii. Travis Mitchell

#### aa. Background

Williams asserts that Travis Mitchell witnessed the officers search Williams outside Augie's on January 17, 2004. Mitchell was listed in the police report as a witness to the incident on that date; however, the report does not mention Mitchell as a witness to any search or arrest. The report states only that Mitchell was in a Jeep next to a gun recovered by the police. He denied knowledge of the gun, was identified, "and sent."

Based on the testimony of private investigator Warren Robinson, Williams asserts that Mitchell could have testified how thoroughly the police searched Williams at the time of his arrest. Robinson was hired by Williams' original attorney, Lee Johnson, to investigate Williams' case in the summer of 2004. In October 2004, Williams hired Harris to replace Johnson, so, according to Robinson, he was no longer working the case. He testified that he contacted Harris in the next month and offered to continue his investigative work. Robinson testified that Harris told him that she did not need an investigator.

Robinson explained that he interviewed Mitchell before Harris was hired because he was listed on the police reports as a witness to the January 17, 2004,

incident.  According to Robinson, Mitchell was a witness to how the police

thoroughly searched Williams at the time of his arrest.

In a pretrial recorded telephone conversation between Williams and Harris,

they discussed when Williams' mother would visit Harris.  Harris stated, "See, the

only - the only problem is, is Travis is leaving out of town."  She continued, "And I

don't know when he's coming back.  So she needs to come see me like ASAP."

(Def. Ex. 2 at 2.)  Williams testified that this conversation indicated that Harris

was waiting for a payment from his mother before she would go talk to Mitchell.

During the April 25, 2006, hearing, Harris testified that Robinson told her

that Mitchell had refused to give him a statement.  She also testified that she had

an agreement with Williams that his family paid the investigator fees.  Finally, she

stated that her reading of the police reports was that Mitchell was in a Jeep next

to the car Williams was in and saw a gun in the parking lot.  There was no

indication that he saw the police search Williams.

### bb.    Deficiency of Harris's Performance

Williams argues that this case is like <u>Chambers v. Armontrout</u>, in which the

Eighth Circuit determined that it was unreasonable for counsel to not interview a

witness when that witness was the only witness who saw the entire altercation

between the defendant and the victim and the only possible defense was self

defense.  907 F.2d 825, 830-31 (8th Cir. 1990).  Williams asserts that his only

defense was that police thoroughly searched him in the parking lot and did not find crack.  Thus, the police must have planted the crack.

Williams claims that Mitchell would have testified that the police thoroughly searched him in the parking lot and did not find crack.  This testimony would demonstrate that the only way the police could have found crack in his pocket when Williams was booked at the Hennepin County Jail was because the police planted it.

Harris's decision to not interview a particular witness must be evaluated from the perspective of counsel at the time that the decision was made.  Parker v. Bowersox, 94 F3d 458, 461 (8th Cir. 1996).  Counsel is not ineffective for failing to perform actions that are futile.  Garrett v. United States, 78 F.3d 1296, 1303 n.11 (8th Cir. 1996).  Harris testified that when she became Williams' lawyer, she knew that Robinson had already worked on the case and that he had attempted to interview Mitchell but that Mitchell had refused to give a statement.  The police report for the January 17, 2004, incident does not state that Mitchell witnessed a search.  Thus, Harris was not unreasonable to decide not to attempt to interview Mitchell after he had refused to give a statement.

Counsel's decision not to call a "hostile and grudging" witness is also reasonable.  Walls v. Bowersox, 151 F.3d 827, 834 (8th Cir. 1998).  The Court finds Harris's testimony credible that Robinson told Harris that Mitchell refused to

be interviewed and that Williams admitted possessing the crack.  These facts, in

conjunction with the fact that the police report did not mention Mitchell viewing

a search, made it reasonable for Harris to not interview or call Mitchell.  However,

even if Harris's decision to not interview Mitchell was unreasonable, Williams has

failed to show prejudice.

### cc.     Prejudice

Williams failed to submit admissible evidence of the substance of Mitchell's

testimony by failing to call him as a witness at the evidentiary hearing.  The

defense investigator's recounting of what Mitchell said during a telephone

interview during a break in the April 25, 2006, evidentiary hearing was not

credible proof of what Mitchell's testimony would have been.  In any case, as the

Court previously held, this hearsay evidence was not admissible.

Even if defense counsel's version of what Mitchell's testimony would have

been is accurate, Williams cannot prove that the testimony would have been

substantially valuable.  Mitchell would have been readily impeached because

Special Agent David Nygren interviewed Mitchell in person on December 15,

2004.  (Gov't Ex. J.)  In that interview, Mitchell stated that he did not see police

officers struggling with a person that night and he was not certain if anyone had

been arrested that night.  He also stated that he could not clearly recall what had

occurred that night because it was a long time ago.

Because there is no admissible evidence regarding helpful information to which Mitchell would have testified if called, Williams cannot show a reasonable probability that, but for Harris's error, the outcome of the trial would have been different.

### iv.    Mario Williams

### aa.    Background

In July 2004, Nunziata Williams' Buick Riviera was repossessed from Club Cristal by Ultimate Repossessions, Incorporated.  When Ultimate Repossessions searched the car, it found a gun.  At trial, the Government argued that the gun in the car belonged to Larry Williams.

At the April 25, 2006, evidentiary hearing, Mario Williams, Larry Williams' brother, testified that he was at Club Cristal the night the car was towed, although he did not witness the repossession.  He did witness Larry Williams' arrest and he confirmed that Larry Williams spoke with Harris on the telephone.  He also testified that when Nunziata William's Riviera arrived at Club Cristal, Larry Williams was not present.  Mario Williams pled the Fifth Amendment when asked whether he came to Club Cristal in that car, whether he knew that there was a gun in that car, and whether he knew Larry Williams carried a gun.

### bb.    Deficiency of Harris's Performance

Larry Williams asserts that Harris should have interviewed Mario Williams

regarding whether Larry Williams had the Riviera that night.  Williams also asserts that Harris should have interviewed Officer Harvel, who allegedly saw Mario Williams pull up to the Club and knows him.  Officer Harvel was not a witness at the April 25, 2006, hearing.  Larry Williams claims both could have testified that he was not in possession of the Riviera where the gun was found; thus, the firearm was not his.

Harris was not ineffective for failing to interview or call Mario Williams because she had no reason to believe that he had testimony that would be useful or helpful.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691.

Harris testified that Larry Williams never told her that Mario Williams had driven the car to Club Cristal that night or that it was Mario Williams' gun in the car.  Instead, Larry Williams called Harris the night of the incident and told her that the gun in the car was his.  Mario Williams' testimony at the evidentiary hearing corroborates the fact that Larry Williams called Harris at that time.  Additionally, Harris testified that Williams never provided Mario Williams as a potential witness.  She averred that the first time Larry Williams told Harris that he wanted Mario Williams as a witness in his case was on the first day of trial.

### cc.    Prejudice

31

Whether or not Harris's performance was deficient, Williams has not shown a reasonable probability that the jury's verdict would have been different if Harris had interviewed Mario Williams before trial. When Mario Williams testified at the evidentiary hearing, he asserted his Fifth Amendment privilege when questioned about the car and the gun. Thus, the jury would never have heard relevant testimony from Mario Williams because he would have asserted his Fifth Amendment privilege.

Additionally, Williams has not shown that Harris's failure to interview Officer Harvel was prejudicial because Defendant has not proven what Harvel's testimony would have been or that it would have been exculpatory in any way.

### v.      Overall Prejudice

Williams asserts that he was prejudiced by Harris's failure to interview witnesses because overall there are four witnesses whose testimony would have supported Williams' theory of defense.

Although "failing to interview witnesses or discover mitigating evidence may be a basis for finding counsel ineffective . . . [s]uch a failure is not, however, a conclusive indication of ineffective assistance of counsel." Kramer v. Kemna, 21 F.3d 305, 309 (8th Cir. 1994). Williams "must make a substantial showing that, but for counsel's failure to interview or subpoena the witnesses in question, there is a reasonable probability that the result of his trial would have been different."

Id. Thus, Williams must "articulate what exculpatory evidence could possibly have been produced had his counsel interviewed" the witnesses. Id.

Defense counsel's failure to interview any witnesses at all when her client was facing the potential of substantial jail time did warrant inquiry. The Court has now made a searching inquiry into this matter and determines that Williams has not made the required showing under the prejudice prong; thus his ineffective assistance of counsel claim fails.

### 8.    Whether Harris Persuaded Witnesses Not to Testify

Williams alleges that Harris was ineffective because she persuaded his brother, Mario Williams, to not testify at trial. Mario Williams testified that Harris contacted him one week before Larry Williams' trial and told him that if he came forward "about what happened with Larry Williams," he would get in trouble and go to jail and so would Quinn Tucker. (Apr. 25, 2006 Tr. at 121-22.) He explained that this conversation occurred when Tucker was on the telephone with Harris and then handed the telephone to Mario Williams. Larry Williams asserts that Harris demonstrated divided loyalties.

Harris testified under oath that no such conversation ever occurred. Tucker testified that Harris never directed him to not testify at Larry Williams trial. He also testified that he never had a telephone conversation with Harris and then handed the telephone to Mario Williams. Nor did he tell Mario Williams that

Harris told Tucker not to testify.  Only Mario Williams testified to this conversation and there was no other witness or evidence, such as phone records, to corroborate his testimony.

The Court rejects Defendant's argument.  Weighing the evidence before the Court, the Court finds that Harris did not attempt to persuade Mario Williams and Tucker not to testify.  The Court finds Harris's and Tucker's testimony on this issue more believable that Mario Williams'.  Mario Williams' testimony is likely to be biased because he is Defendant's brother.  Furthermore, he first made this claim after the trial was over.  Also, this claim is inconsistent with Larry Williams' accusation that Harris never discussed Mario Williams' potential involvement in Larry Williams' case.  If Harris had no information that Mario Williams was involved, it would make no sense for her to call her client's brother and threaten him, particularly when she would knew that he would likely tell his brother if such a conversation occurred.

Moreover, even if the conversation had occurred, Williams has not demonstrated prejudice from the failure of Mario Williams and Tucker to testify at trial.  As the Court already found, Larry Williams has not shown that Mario Williams or Quinn Tucker had any relevant, helpful testimony to offer at trial.

### 9.   Allegations Related to Williams' Decision to Proceed Pro Se

#### a.   Whether Williams' Waiver of Right to Counsel Was

34

### Knowing, Voluntary, and Intelligent

"A defendant may represent himself only if he makes a knowing, intelligent, and voluntary waiver of his Sixth Amendment right to counsel." United States v. Stewart, 20 F.3d 911, 917 (8th Cir. 1994) (citation omitted).  The court "will find a valid waiver if a district court adequately warns a defendant or if, on the record as a whole, we determine that the defendant knew and understood the disadvantages of self-representation."  Id.

Williams argues that his waiver of his right to counsel was not voluntary because he was forced to choose between his current counsel, Harris, and proceeding pro se.  United States v. Patterson, 140 F.3d 767, 776 (8th Cir. 1998) ("Where a defendant moves for replacement counsel and is told that he must choose between his current counsel and proceeding pro se, his waiver may not be voluntary, depending on the circumstances.") (citation omitted).  See also Gilbert v. Lockhart, 930 F.2d 1356, 1360 (8th Cir. 1991) (holding that defendant's right to counsel was violated when he proceeded pro se after his motion for substitute counsel was denied because he "was offered the "Hobson's choice" of proceeding to trial with unprepared counsel or no counsel at all," and "the state trial court failed to specifically advise him of the perils of proceeding pro se").

> An accused does not have an absolute right to counsel of his own choosing, and a district court may properly require the defendant to choose either to proceed pro se, with or without the help of standby counsel, or to utilize the full assistance of counsel, who would present

35

the defendant's defense.  The substitution of counsel is committed to the sound discretion of the trial court, and the defendant bears the burden of showing justifiable dissatisfaction with appointed counsel to be granted a substitute.

United States v. Mentzos, 462 F.3d 830, 839 (8th Cir. 2006) (citations omitted).

The defense asserts that this case is similar to Berry v. Lockhart, 873 F.2d 1168 (8th Cir. 1989).  The Eighth Circuit held that Berry was entitled to habeas relief because he did not knowingly and intelligently waive his right to counsel.  In Berry, the court did not warn the defendant of the dangers of proceeding pro se and the defendant never agreed to represent himself.  Id. at 1171.  Neither factor is present in this case.

Here, the Court spoke extensively with Williams regarding the perils of proceeding pro se and took a recess so that Williams could speak with Harris and think about his decision.  Additionally, Williams repeatedly expressed his desire to proceed pro se.

When Williams first indicated his desire to discharge Harris, he stated that he would "rather proceed on [his] own, if necessary."  The Court asked: "What is your wish, sir."  Williams responded: "To fire Ms. Harris."  The Court stated: "Then you're going to represent yourself."  Williams replied: "If I have to."  The Court told Williams that he would not continue the trial for Williams to hire another attorney and directed Williams: "You have to represent yourself in this matter."  Williams replied: "Okay."  (Trial Tr. at 341).

36

Later in the morning, the Court explained that defendants often disagree with their attorneys and warned against Williams proceeding pro se.  Williams explained his disagreements with Harris.  The Court took a recess for Williams to speak with Harris and reconsider.  Upon returning from the recess, the Court asked "Mr. Williams, what is your pleasure, sir?"  William stated: "Your Honor, I would like to go forward without Ms. Harris, even as standby counsel."  The Court responded: "All right.  Do you want to represent yourself?"  Williams affirmed: "Yes, sir."  (Id. at 355.)

In this case, the Court spent substantial time with Williams and allowed Williams to voice every concern that he had regarding his relationship with Harris. Williams raised a number of issues that he has again raised in his motion for a new trial and that the Court has again decided were insubstantial.  Williams' choice to represent himself was knowing and intelligent.  He was informed of the dangers of self representation and affirmatively stated his desire to proceed pro se.

The Court also notes that Williams did not make his decision to fire Harris until after the Government had concluded a significant portion of its case in chief. This timing indicates obstructionist tactics by Williams.  See Meyer v. Sargent, 854 F.2d 1110, 1115 (8th Cir. 1988) ("One other major factor leading us to the conclusion that there was no violation of the right to counsel is the fact that the record indicates that Meyer's actions in moving for replacement counsel midway

through the trial were largely obstructionist.").  In this case, Williams did not

move to discharge Harris until after Nunziata Williams had testified and the

Government had concluded a substantial part of its case in chief.  Additionally,

Williams was obstructionist at other point in the trial, refusing to wear civilian

clothing, interrupting the Government's opening statement, and threatening to

interrupt witness testimony.  Williams refused to give his closing argument and

attempted to remove his brace.  At his request, the Court eventually ordered

Harris to give his closing argument.  These factors indicate that Williams' request

was obstructionist.

> **b.    Whether Harris Breached Her Duty of Loyalty by Purposefully Forcing Williams to Represent Himself**

Williams asserts that Harris pushed Williams into self-representation,

thereby failing to fulfil her duty to advocate for her client or her duty of loyalty.

He claims that going pro se was not in his best interest given the severity of the

charges he faced.

Williams asserts that during trial, he did not bring up self-representation

himself.  Instead, Harris brought the issue to the Court.  For example, during a

break in voir dire, Harris informed the Court was Williams was exploring the idea

of representing himself and was not satisfied with her representation.   She told

the Court that Williams might want to address the Court on that issue.  The Court

then had a discussion with Williams, and Williams told the Court that he did not

want to represent himself, that he had already addressed his problems with

Harris, and that it was over.

Williams also points to a note, marked as Defense Exhibit 9, in which Harris

wrote, "If you don't like it, you could fire me.  It's not too late. – do it.  You can

represent yourself."  Williams responded, "Stay focused."  Harris wrote, "You may

be representing yourself."  He asserts that the note demonstrates that Harris was

pushing him into self-representation.

Harris testified that she did not push Williams to go pro se.  She testified

that her note was sarcastic, that she believed that the trial was going well, and

that she did not want to be fired.

The Court finds that the notes in Defense Exhibit 9 stemmed from Harris's

sarcasm due to her repetitive arguments with Williams about her performance

and his dissatisfaction with it.  In any case, Williams himself made comments

indicating his desire to fire Harris.  For example, he wrote, "You will ask that

question or get someone in here that will," and "Either you ask the question or

remove yourself."  (Gov't Ex. J.)

"There is no question that the district court enjoys authority to disallow

substitution of counsel.  The defendant must show good cause for such

substitution to be allowed after the start of a trial."  United States v. Christian, 861

F.2d 195, 197 n.2 (8th Cir. 1988).  "That [a defendant] did not particularly like

the choice presented to him and that he did not want to proceed pro se are not

sufficient reasons to render the choice constitutionally offensive.  The question,

therefore, is whether [the court's] refusal to assign new counsel which in turn

forced the defendant to select from among the unwanted options placed [the

defendant] in a dilemma of constitutional magnitude."  McKee v. Harris, 649 F.2d

927, 931 (2d Cir. 1981) (citations omitted), cited in Christian, 861 F.2d at 197 n.2.


As already noted, the Court had an extended discussion with Williams

about his decision to go pro se, ensuring that he had a clear understanding of his

choice.  The Court rejects Williams' argument because Williams has not shown

that Harris was ineffective, that is, that her performance was deficient and caused

prejudice to Williams.  The Court also concludes that Harris did not "push"

Williams into self-representation.

### 10.    Whether Harris Was Ineffective as Standby Counsel

Williams also claims Harris was ineffective as standby counsel.  He asserts

that while Harris was still representing him, she did not let him have his own copy

of Jencks materials.  Instead, she told Williams to read the transcripts while in

Court.  Williams also asserts that Harris withheld grand jury testimony of Nunziata

Williams and ATF Agent Nygren.  Williams argues that under the Jencks Act, the

defendant has a personal right to have copies of witness statements.  18 U.S.C.

§ 3500.

For the purpose of deciding this motion, the Court assumes, without
deciding, that Williams states a cognizable claim for ineffective assistance of
standby counsel. But see United States v. Foster, No. 98-2337, 2000 WL 1511762,
at *1 (8th Cir. Oct. 12, 2000) (unpublished) (holding that "because [defendant]
had no constitutional right to standby counsel . . .  [defendant] . . . cannot claim
ineffective assistance of standby counsel.") (citations omitted).  Even if Williams'
right to view the Jencks Act material was violated, which is not clear as the
statute merely requires receipt of the witness statements after the witness has
testified on direct examination, 18 U.S.C. § 3500, Fed. R. Crim. P. 26.2, the Court
concludes that Williams' claim lacks merit because he cannot show prejudice.

During the evidentiary hearing, Williams testified that he could have used
the withheld materials to impeach Nunziata Williams and Special Agent David
Nygren, but he did not specifically explain how he would have impeached them.
Harris was still representing Larry Williams the first time that Nunziata Williams
testified, and she used the grand jury testimony in her cross examination.
Williams recalled Nunziata Williams, but he does not specifically state how he
would have impeached her.  Similarly, Williams has not explained how he would
have impeached Nygren.  Williams has not pointed to any particular Jencks
material that he could have used to impeach any of the trial witnesses.

41

**11.     Conclusion**

Having extensively examined Williams' allegations, the Court concludes that he is unable to show ineffective assistance of counsel.  The Court has analyzed each of Williams' allegations in detail.  Overall, Williams has failed to show prejudice, that is, a reasonable probability but that for Harris's errors, the outcome of the trial would have been different.  For the foregoing reasons, Williams' Motion for a New Trial is denied.

Based upon the files, records, and proceedings herein **IT IS HEREBY ORDERED** that:

1.     Defendant Larry Darnell Williams' Motion for Acquittal Notwithstanding the Verdict [Docket No. 123] is **DENIED**.

2.     Williams' Motion to Dismiss for Ineffective Assistance of Counsel [Docket No. 124] is **DENIED**.

3.     Williams' Motion for New Trial [Docket No. 126] is **DENIED**.

Dated: February 15, 2007                    s / Michael J. Davis
                                            Judge Michael J. Davis
                                            United States District Court