# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Criminal File No. 04-313 (MJD/FLN)
        Civil File No. 10-4185 (MJD)

LARRY DARNELL WILLIAMS,

        Defendant.

---

Chris S. Wilton, Assistant United States Attorney, Counsel for Plaintiff.

Larry Darnell Williams, pro se.

---

## I.      INTRODUCTION

This matter is before the Court on Petitioner Larry Darnell Williams' Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.  [Docket No. 214]

## II.     BACKGROUND

### A.      The Indictments

Williams was originally indicted in July 2004 and was represented by CJA panel counsel Lee Johnson.  The original Indictment charged Williams with

Count 1, possession with intent to distribute crack, Count 2, possession of a

firearm during a drug trafficking crime, and Count 3, felon in possession of a

firearm, all occurring on January 17, 2004.  In October 2004, Williams retained

attorney Calandra Harris to replace Johnson.

The Government filed a Superseding Indictment against Williams on

December 21, 2004, adding a count for drug trafficking conspiracy, a count for

possession of a firearm during a drug trafficking crime, and a count for felon in

possession of a firearm, all related to Williams' arrest in July 2004.

In the Second Superseding Indictment, filed February 15, 2005, the

Government added a crack possession charge related to May 19, 2004.  In the

Second Superseding Indictment, Williams was charged with: Count 1, drug

trafficking conspiracy to distribute and to possess with intent to distribute a

mixture or substance containing a detectable amount of cocaine base "crack,"

from January 2004 to July 15, 2004; Count 2, possession with intent to distribute a

mixture or substance containing a detectable amount of cocaine base "crack," on

January 17, 2004; Count 3, possession with intent to distribute a mixture or

substance containing a detectable amount of cocaine base "crack," on May 19,

2004; Count 4, possession of a firearm during a drug trafficking crime, on

January 17, 2004; Count 5, felon in possession of a firearm, on January 17, 2004;

Count 6, possession of a firearm during a drug trafficking crime from March 2004

to July 15, 2004; and Count 7, felon in possession of a firearm from March 2004 to

July 15, 2004.  On March 10, 2005, the Court granted the Government's motion to

dismiss Counts 4 and 5 - the gun charges related to Williams' January 17, 2004

arrest.  Counts 6 and 7 became new Counts 4 and 5 - gun charges relating to the

time period March 2004 to July 15, 2004.  Williams' trial was scheduled to begin

on March 10, 2005.

### B.    Possible Conflict of Interest Regarding Nunziata Williams

On March 8, 2005, the Government filed a Notice of Possible Issue of

Successive Representation.  [Docket No. 113]  The Government had learned that

Harris had contact with Nunziata Williams, one of the Government witnesses for

Williams' upcoming trial.  It asserted that Harris had represented Larry Williams

in connection with a robbery, for which both Larry Williams and Nunziata

Williams were arrested.  At Larry Williams' direction, Harris had visited

Nunziata Williams while she was in jail.  The Government further alleged that

Nunziata Williams also sought Harris's advice on a family law matter, but never

retained Harris.

The Court ordered a hearing on March 10 to address the conflict of interest issue.  At the conclusion of the hearing, the Court concluded that the possibility of a conflict was remote.  [Docket No. 117]  Out of an abundance of caution, the Court informed Williams that, although a conflict was unlikely to arise, he had the option to continue the trial and obtain new counsel.  Williams clearly indicated his desire to continue with Harris's representation.  The Court concluded that he gave a knowing and intelligent waiver of any potential conflict of interest that Harris may have had as a result of her prior contact with Nunziata Williams and permitted Harris to continue in her representation of Larry Williams.

## C.   Discharge of Calandra Harris and the Verdict

Larry Williams' trial commenced on March 10, 2005.  On March 14, Williams moved to discharge Harris and to represent himself for the remainder of the trial.  The Court conducted a hearing on the issue of self-representation and granted a recess to allow Williams to further discuss the issue with Harris. After the recess, Williams again asserted his desire to proceed pro se.  The Court granted Williams' motion, concluding that he had voluntarily and intelligently

decided to exercise his right to self-representation.  [Docket No. 121]  The Court

ordered Harris to continue as standby counsel for Williams.

The following morning, March 15, Williams requested that Harris give a

closing argument on his behalf to the jury.  After a prolonged colloquy with

Williams, the Court ordered Harris to give the closing argument.

On March 16, the jury found Williams guilty of Counts 1, 2, 3, and 5.  The

jury found Williams not guilty of Count 4.  [Docket No 136]

D.    Post-Trial Motions

Following the verdict, Williams filed three pro se motions: Motion for

Acquittal Notwithstanding the Verdict [Docket No. 123], Motion to Dismiss for

Ineffective Assistance of Counsel [Docket No. 124], and Motion for New Trial

[Docket No. 126].  On October 25, 2005, the Court appointed Assistant Federal

Public Defender Andrea George to represent Williams and assist him with his

post-trial motions.

The parties appeared for an evidentiary hearing on November 21, 2005.

However, the Court continued the hearing because Williams sought to discharge

George as his attorney and to hire replacement counsel.  [Docket Nos. 153, 158-

59, 167]  On April 25, 2006, the Court held the evidentiary hearing on Williams'

post-trial motions, with George representing Williams.  Investigator Warren

Robinson; Petitioner's brother, Mario Williams; Petitioner; Federal Defender

Investigator Timothy Trebil; Quinn Tucker; and Calandra Harris all testified at

the hearing.  The parties then submitted post-hearing briefing.

On February 15, 2007, the Court issued its Order denying Williams' post-

trial motions.  [Docket No. 187]  In its Order, the Court extensively analyzed

Williams' claim that Harris was ineffective.

### E.      Sentencing

On February 15, 2007, Williams filed a letter requesting that this Court

recuse itself based on Williams' allegation of a personal relationship between

Harris and the undersigned Judge and expressing dissatisfaction with his

counsel.  [Docket No. 188]  On February 16, 2007, the Court denied Williams'

request for recusal because the undersigned judge had no personal relationship

with Harris and denied his request to remove George as his counsel because

there was no basis for appointing substitute counsel and the letter did not

constitute a knowing and voluntary waiving of Williams' right to counsel.

[Docket No. 189]

On March 30, 2007, Defendant appeared before the Court for sentencing. He represented that he was in the process of hiring another attorney and requested a 90-day delay.  The Court granted his request and continued the sentencing until June 29 to permit Defendant additional time to retain new counsel.

On June 29, 2007, the Court held the sentencing hearing.  Williams had not retained new counsel.  At the beginning of the hearing, the Court granted Williams' request to remove George, and Williams proceeded pro se.  The Court sentenced Williams to 360 months in prison, the low end of the Guideline range. The Court then ordered the Federal Defender's Office to file a Notice of Appeal on behalf of Williams.  [Docket No. 202]

**F.    Appeal**

George filed a Notice of Appeal on behalf of Williams on July 5, 2007. [Docket No. 204]  Assistant Federal Defender Katherine M. Menendez was appointed to represent Williams on his appeal.  [Docket Nos. 206-07]

On April 15, 2008, the Eighth Circuit affirmed the judgment of this Court. [Docket No. 211]  In its opinion, the appellate court addressed Williams' claim that he was deprived of effective assistance of counsel by Harris because she

failed to interview or call Quinn Tucker, Travis Mitchell, and Mario Williams.

United States v. Williams, 562 F.3d 938, 941 (8th Cir. 2009).  The court explained

that it would "consider this claim on direct appeal, because the record has been

fully developed."  Id.  The appellate court also addressed Williams' assertions

that his relationship with Harris resulted in a complete breakdown in

communication and that his decision to represent himself was not voluntary.  Id.

at 942.

       In October 2009, the U.S. Supreme Court denied Williams' petition for a

writ of certiorari.

       **G.     Disciplinary Action Against Harris**

       In September 2008, the Minnesota Office of Lawyers Professional

Responsibility filed a Petition for Disciplinary Action against Harris.  See In re

Disciplinary Action Against Harris, 765 N.W.2d 389, 389 (Minn. 2009).  Among

other things, the petition included allegations related to Williams' case, including

a lack of diligence and failure to communicate, unethical billing,

misappropriation of funds, and misrepresentations to this Court, the Director of

the District Ethics Committee ("DEC"), and the DEC investigator.  (Williams

Appendix 2, Petition for Disciplinary Action ¶¶ 14-39.)  In particular, the petition

8

alleged that Harris lied to this Court regarding whether Williams requested that she investigate and call Quinn Tucker as a witness in Williams' trial.  (Id. ¶¶ 35-37.)

In April 2009, Harris admitted the allegations in the petition.  (Williams Appendix 3.)   On May 14, 2009, she was indefinitely suspended from the practice of law for a minimum of 90 days.  See In re Disciplinary Action Against Harris, 765 N.W.2d at 389.  On March 8, 2011, she was reinstated to the practice of law and placed on a two-year probationary period.  See In re Harris, 796 N.W.2d 145, 145-47 (Minn. 2011).

### H.      Habeas Petition

Williams has now filed a pro se Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.  [Docket No. 214]  Williams bases his petition on three grounds: ineffective assistance of counsel at trial; ineffective assistance of counsel on appeal; and prosecutorial misconduct.

## III.   DISCUSSION

### A.      Standard for Relief Under 28 U.S.C. § 2255

28 U.S.C. § 2255(a) provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that

the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice. A movant may not raise constitutional issues for the first time on collateral review without establishing both cause for the procedural default and actual prejudice resulting from the error.

United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996) (citation omitted).

Alternatively, the procedural default can be excused if the defendant is actually innocent. Bousley v. United States, 523 U.S. 614, 622 (1998).

A petitioner is entitled to an evidentiary hearing on a § 2255 motion,

"[u]nless the motion and the files and records of the case conclusively show that

the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

[A] petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.

Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995) (citations omitted).

**B.    Claim of Actual Innocence**

10

At the outset, the Court will address Williams' claim that he is actually innocent.

### 1.      Legal Standard

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." House v. Bell, 547 U.S. 518, 536-37 (2006) (citation omitted).  In other words, "to remove the double negative, [the petitioner must establish] that more likely than not any reasonable juror would have reasonable doubt." Id. at 538. "To be credible" a gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995).  In other words, a petitioner must "come forward with new reliable evidence which was not available at trial through the exercise of due diligence." Kidd v. Norman, 651 F.3d 947, 953 (8th Cir. 2011).

The Court presumes that "a reasonable juror would consider fairly all of the evidence presented" and "would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." Schlup, 513 U.S. at 329.

Williams asserts that the evidence of Mario Williams' new affidavit professing ownership and possession of the gun; of Nunziata Williams' credibility issues related to her immigration status, identity, and social security number; of the claim that Travis Mitchell would have testified that he witnessed Petitioner's arrest on January 17, 2004, and saw a thorough search of his person; and of Harris's unethical and unprofessional behavior, combined with the evidence presented at trial, establish that it is more likely than not that any reasonable juror would have found Petitioner not guilty of all counts.

The Court finds that Petitioner has failed to meet his burden to show actual innocence on any of the four counts of conviction. The Court has come to this conclusion after a thorough and holistic review of the evidence presented at trial and the new evidence presented by Petitioner. To explain its conclusion, the Court provides an analysis as to each count of conviction.

### 2.    Count 1

Petitioner's new evidence regarding Nunziata Williams relates to Count 1, drug trafficking conspiracy to distribute and to possess with intent to distribute a mixture or substance containing a detectable amount of cocaine base "crack," from January 2004 to July 15, 2004. Among other evidence, Nunziata Williams

testified that Petitioner told her that he sold drugs (Trial Tr. 284) and kept crack

cocaine and a gun her home (id. 268).  She testified that, at her request, during

the time period in question, Petitioner agreed to have her sell crack cocaine for

him.  (Id. 285.)  She sold crack cocaine for Petitioner two to three times every

other day for four to five weeks.  (Id. 285-88.)  She further testified that she

would also drive Petitioner on his route so that he could sell crack cocaine.  (Id.

287.)

Petitioner asserts that the evidence regarding discrepancies with regard to

Nunziata Williams' identity, immigration status, and social security number

impeach her credibility as to meet his burden to show actual innocence as to

Count 1.  The Court concludes that Petitioner has not met his burden.  The

evidence submitted regarding Nunziata William's identity, social security

number, and immigration status is equivocal, at best.

### a)      Social Security Number

In his briefing, Petitioner claims that Nunziata Williams is using a false

social security number.  The evidence presented is not reliable evidence that this

is the case.  At most, it raises a question about the social security number, but is

insufficient to show that Nunziata Williams has engaged in any dishonesty with

regard to her social security number.  Williams provides a report from Peart &

Associates stating that Nunziata Williams may have been adopted by a family in

Nevada, a conclusion which is based on Petitioner's stated belief that she entered

the United States from Liberia and was taken in or adopted by a family in

Nevada.  (Williams Appendix 7.)  A letter from Robinson provides information

that Nunziata Williams was adopted by John Williams in Texas, when she was

two years old.  (Williams Appendix 8.)  The report from Peart & Associates states

that the social security number associated with a "Nunziata Williams" "is also

tied to Filimon Lazo (age 41) of Caldwell, TX."  (Williams Appendix 7.)  The

investigator surmises that, "[s]ince the number was indeed issued in Texas and

Filimon Lazo is a long-time resident of Texas, it is the smart bet that Filimon

Lazo is the true owner of [the] SSN."  (Id.)  However, the investigator does not

consider the evidence presented in the Robinson Report that Nunziata Williams,

herself, was adopted in Texas and, so, just as likely would have had a social

security number issued in Texas.  (Williams Appendix 8.)  There is no reason to

believe that it is more likely that Nunziata Williams is using Lazo's social

security number than to believe that Lazo is using Nunziata Williams' social

security number.  In any case, the Peart & Associates investigator opines, "This

does not mean that Filimon Lazo's SSN, is being used fraudulently by Ms.

Williams.  There is that possibility; however, it could be human error on the part

of data entry personnel somewhere down the line, **which is most often the case**."

(Id. (emphasis added).)  Considering all of the evidence provided by Petitioner

regarding Nunziata Williams' social security number, it is possible that she has

used an incorrect social security number, but there is certainly no reliable

evidence that she did so, let alone, did so dishonestly.  Additionally, there is no

indication why this equivocal evidence would not have been available at trial

through the exercise of due diligence.

### b)     Veterans Benefits

Petitioner asserts that Nunziata Williams is somehow improperly

receiving benefits from the Department of Veterans Affairs or lying about

receiving them.  He points to her testimony at trial: "I get VA benefits.  I get

checks every month.  If I give [Petitioner] money, it came from that."  (Trial Tr.

312.)  Petitioner further asserts his personal belief that Nunziata Williams was

not discharged from the military due to a permanent disability sustained in

military service, is not a surviving dependent of a veteran, and is not a widow of

a veteran.  (See Williams Appendix 7.)  This is not new evidence.   Nunziata

Williams testified at trial that she received these benefits and Petitioner had the

opportunity to cross examine her on his belief that she does not qualify, both

when she testified in the Government's case-in-chief and when Petitioner called

her as his own witness.

### c) Immigration Status

Petitioner presents no reliable evidence that Nunziata Williams has an

improper immigration status.  He provides investigative reports that provide

unauthenticated information that Nunziata Williams may have been adopted in

Texas or Nevada and, therefore, is a U.S. citizen, or that she is a Liberian citizen

with permanent resident status.  (Williams Appendices 7-8.)  The reports also

indicate that she would not give her alien registration number to Petitioner's

investigator, which she was not required to do, and that Petitioner's investigator

could not find an alien registration number under her current name.  (Williams

Appendix 5, Robinson Aff. ¶¶ 11-13; Williams Appendix 8.)  Investigator

Robinson states that he did not find an immigration record connected to the

name "Nunziata Williams" or any of the names associated with her identity.

(Williams Appendix 5, Robinson Aff. ¶ 10.)  While this preliminary information

raises questions about her immigration status, it is far from new reliable evidence

of malfeasance.  In fact, there is no indication why this, albeit weak, evidence

would not have been available at trial through the exercise of due diligence.

Overall, the evidence regarding Nunziata Williams' credibility does not

rise to the level of reliable new evidence that was not available at trial through

the exercise of due diligence.  In any event, the Court concludes that, even if the

jury had considered the evidence now offered by Petitioner to weaken Nunziata

Williams' credibility along with all of the other evidence in the case, it is not

more likely than not that no reasonable juror would have found Petitioner guilty

beyond a reasonable doubt.

### 3.    Count 2

Williams' evidence regarding Travis Mitchell relates to Count 2,

possession with intent to distribute a mixture or substance containing a

detectable amount of cocaine base "crack," on January 17, 2004.  At trial,

testimony established that Petitioner was arrested in a parking lot in downtown

Minneapolis on January 17, 2004.  (Trial Tr. 202.)  In the parking lot, officers

testified that they conducted "a quick pat search" of Petitioner's person after

handcuffing him, but did not conduct a thorough search.  (Id. 230-32.)  They

found nothing during the pat down search and transported Petitioner to the First

Precinct and then the Hennepin County Jail.  (Id. 202, 232.)  Deputy Scott Nelson

testified that he conducted a thorough search of Williams while booking him at

the Hennepin County Jail.  (Id. 246-50.)  He testified that, during that search, he

found five individually wrapped rocks of crack cocaine in petitioner's right front

coin pocket, which is a common place to find drugs during a custodial search.

(Id. 250-52, 262.)

Williams claims that the police planted the drugs on him.  He asserts that

new evidence regarding Travis Mitchell, a man who witnessed Petitioner's arrest

in the parking lot, supports his claim that the drugs were planted, because

Mitchell would testify that he observed the police conduct a thorough search of

Williams during his arrest and, yet no drugs were recovered at that time.

Williams directs the Court to an April 26, 2006, memorandum from

Investigator Timothy Trebil to Williams' counsel that purports to recount the

contents of a telephone conversation Trebil had with a Mitchell during a break in

the April 25, 2006, post-trial motions hearing.  (Williams' Appendix 6.)  This

evidence is substantially the same as the evidence Williams presented during

that post-trial motions hearing.  See Williams, 2007 WL 518856, at *13.  Today, the

Court has evidence that Harris breached her ethical duties by misappropriating

18

the funds given to her to investigate Mitchell.  However, it still does not have

reliable evidence of what Mitchell's testimony would have been.

Even if the Court fully credits Mitchell's statement as recounted in the

Trebil Report, it merely recounts that Mitchell saw Williams being thoroughly

searched during his arrest in the parking lot.  It does not state whether or not he

saw police specifically search Petitioner's coin pocket.  As the Court previously

noted, if Mitchell had testified at trial, he "would have been readily impeached

because Special Agent David Nygren interviewed Mitchell in person on

December 15, 2004," and "[i]n that interview, Mitchell stated that he did not see

police officers struggling with a person that night and he was not certain if

anyone had been arrested that night.  He also stated that he could not clearly

recall what had occurred that night because it was a long time ago."  Id. at *13.

The Court concludes that Williams has not come forward with new

reliable evidence that was not available at trial through the exercise of due

diligence.  In any event, the Court concludes that, even if the jury had considered

the evidence now offered by Petitioner along with all of the other evidence in the

case, it is not more likely than not that no reasonable juror would have found

Petitioner guilty beyond a reasonable doubt.

### 4.   Count 3

None of the new evidence relates to Count 3, possession with intent to distribute a mixture or substance containing a detectable amount of cocaine base "crack," on May 19, 2004.  No new evidence impeaching any of the witnesses who testified to the events surrounding Count 3 has been offered.  Nor is there any new evidence casting doubt on the verdict as the Count 3.  Petitioner has not met his burden with regard to Count 3.

### 5.   Count 5

Petitioner's new evidence regarding Mario Williams relates to Count 5, felon in possession of a firearm from March 2004 to July 15, 2004.  Additionally, the previously discussed evidence regarding Nunziata Williams relates to this count.

At trial, evidence showed that, during July 2004, Petitioner regularly drove a Buick Riviera owned by Nunziata Williams.  (Trial Tr. 275-77.)  On July 9, 2004, Petitioner and Nunziata Williams were at Club Cristal.  (Id. 277-78.)  As she was leaving, Petitioner asked her where the Buick Riviera was, and, when they discovered it was gone, Petitioner asked her to find it because "[t]here was stuff in it," meaning a gun.  (Id. 280-81.)  That night, the car had been

repossessed.  (Id. 277, 360-61.)  The repossession company searched the car at the

impound lot and found a loaded .45 caliber gun under the front driver's seat,

which the company turned over to law enforcement.  (Id. 366, 373-76, 389.)

At trial, Jesse Pender testified that he had seen Williams driving the

Riviera and then saw Williams grab a gun from behind the passenger seat of the

Riviera.  (Trial Tr. 321-24.)  Pender described the gun that he saw as consistent

with the gun that forms the basis for Count 5.  (Id. 323-24; Govt. Ex. 53.)

Nunziata Williams also provided extensive, detailed testimony that the gun in

question was Petitioner's gun, which he kept with him wherever he went and

which she had seen him hide it under the car seat of the Buick Riviera.  (Trial Tr.

268-71.)  Her testimony that she had seen Williams fire the gun over the

windshield of the Buick Riviera was corroborated by ballistics testing showing

that a spent shell casing trapped in the windshield wiper well of the car was fired

by the .45 caliber handgun that forms the basis for Count 5.  (Id. 274-75, 391-92;

418.)

At the April 25, 2006, post-trial motions hearing, after consulting with his

own counsel, Mario Williams asserted his Fifth Amendment right not to testify

when asked questions about the Buick Riviera and the gun found in that car on

July 9, 2004, and whether he knew Petitioner to carry a gun.  (Apr. 25, 2006 Tr. 152-53.)

As new evidence, Petitioner points to a non-notarized 2010 affidavit from his brother, Mario Williams, waiving the Fifth Amendment privilege that he asserted during the post-trial motions evidentiary hearing.  In the affidavit, Mario Williams states that he was the sole driver of the Riviera on the relevant night, that Williams was not with him, that the gun found in the car was Mario Williams', that he bought the gun from Julius Roland on July 2, 2004, and that he had brought it to the club with him that night.  (Williams Appendix 4, M. Williams Aff. ¶¶ 2-5.)  He also asserts that he had agreed to be a witness during Williams' trial but changed his mind because Harris warned him that he could be charged as a co-conspirator, his daughter had just been born, and he had contact with law enforcement at the time. (Id. ¶ 7.)  Mario Williams already testified regarding this accusation during the post-trial motions hearing.  (See, e.g., Apr. 25, 2006 Tr. 121-22, 124-25, 156.)   In his 2010 affidavit, he then states that, he invoked the Fifth Amendment during the post-trial motions hearing "based on the advice of [his] attorney."  (Id. ¶ 8.)  Mario Williams had an independent attorney, not Harris, with whom he consulted at that hearing.

Mario Williams' new affidavit, which is not notarized, suddenly taking the blame for the gun years after the trial in this matter, despite previously asserting his privilege not to testify about this matter at the post-trial evidentiary hearing, is new evidence that assists in Petitioner's defense.  However, it is insufficient to meet Petitioner's burden under the actual innocence test.

First, Mario Williams is Petitioner's brother.  The Eighth Circuit has noted that "the testimony of alibi witnesses, especially friends and relatives of the defendant, does not assure an acquittal and is sometimes counterproductive." Freeman v. Graves, 317 F.3d 898, 901 (8th Cir. 2003) (citation omitted).  More importantly, the evidence at trial strongly established that the gun belonged to the Petitioner.  Nunziata Williams gave detailed testimony showing that Petitioner drove that car, that the gun was Petitioner's, that he stored his gun in that location in that car, and that, on that night, he told her that his gun was in that car.  Her testimony was corroborated by physical evidence of the shell casing found in the windshield of the car.  Additionally, Pender provided testimony that Petitioner possessed a gun, matching the description of the gun that was found, that Petitioner kept in that car.

The Court concludes that, even if the jury had considered the evidence now offered by Petitioner regarding Mario Williams and Nunziata Williams along with all of the other evidence in the case, it is not more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt.

### C.    Williams' Claim of Ineffective Assistance of Counsel at Trial

#### 1.    Ineffective Assistance of Counsel Standard

In order to gain relief, Williams must establish both that his counsel's performance "fell below an objective standard of reasonableness," and that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 688, 692 (1984).  The burden is on Williams to establish a "reasonable probability that, but for counsel's unprofessional errors, the result would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  Thai v. Mapes, 412 F.3d 970, 978 (8th Cir. 2005) (quoting Strickland, 466 U.S. at 687).

Counsel's performance is deficient if it falls outside of the "wide range of reasonable professional assistance," although there is a strong presumption that counsel's conduct falls within this broad spectrum. <u>Strickland</u>, 466 U.S. at 689. "Counsel's performance is deficient when it is less competent than the assistance that should be provided by a reasonable attorney under the same circumstances." <u>Chambers v. Armontrout</u>, 907 F.2d 825, 828 (8th Cir. 1990) (citing <u>Strickland</u>, 466 U.S. at 687).

### 2.    Investigation of Mario Williams

Williams raised the issue of his trial counsel's failure to investigate or call Mario Williams as a witness in his direct appeal. The Eighth Circuit held that "Williams has thus failed to demonstrate that Mario would have given favorable testimony, or that Williams suffered prejudice from Harris's failure to interview and call Mario as a witness at trial." <u>United States v. Williams</u>, 562 F.3d 938, 942 (8th Cir. 2009). "Issues raised and decided on direct appeal cannot ordinarily be relitigated in a collateral proceeding based on 28 U.S.C. § 2255." <u>United States v. Wiley</u>, 245 F.3d 750, 752 (8th Cir. 2001). An exception exists "only when petitioners have produced convincing new evidence of actual innocence." <u>Id.</u> This exception is "rare, and available only in the extraordinary case." <u>Id.</u>

(citations omitted).  The Court has already explained that the actual innocence

exception does not apply here.  Therefore, Petitioner's arguments based on

Harris's investigation of and failure to call Mario Williams are foreclosed.

Furthermore, even if the Court were to consider Petitioner's ineffective assistance

of counsel argument, he fails the <u>Strickland</u> test because he cannot show

prejudice.

Williams points out that this Court's decision denying his post-trial

motions and the Eighth Circuit's decision affirming it were based, in part, on

crediting Harris's testimony as credible.  He asserts that, given new evidence,

crediting Harris's testimony was wrong.  As new evidence, Williams provides

the new affidavit from Mario Williams, discussed above.

Petitioner claims he was prejudiced by Harris's failure to investigate Mario

Williams as a defense witness.  <u>See</u> <u>Grooms v. Solem</u>, 923 F.2d 88, 91 (8th Cir.

1991) ("Prejudice can be shown by demonstrating that the uncalled alibi

witnesses would have testified if called at trial and that their testimony would

have supported [the defendant's] alibi.").  Petitioner argues that Mario William's

affidavit establishes that the gun belonged to Mario Williams and that without

Harris's warning he would have come forward to exonerate the Petitioner at

trial.

The Court concludes that, regardless of the deficiency of Harris's

performance, Petitioner cannot show he was prejudiced because he cannot show

a reasonable probability that the verdict on Count 5 would have been different if

Harris had investigated Mario Williams before trial.

Mario Williams asserted his Fifth Amendment privilege when testifying at

the post-trial evidentiary hearing in 2006. According to his affidavit, he decided

not to testify at trial based, in part, on Harris's advice to him. However, also

according to his affidavit, he asserted his Fifth Amendment privilege not to

testify about the gun, the car, or Petitioner and the gun in 2006 based on the

advice of his independent counsel provided to him at the time. Years after the

trial, Mario Williams now has decided to waive his privilege and assert that the

gun was, in fact, his. However, the relevant question is what testimony he

would have provided six years ago, at trial, had Harris investigated him and

called him as a witness. The evidence clearly establishes that Mario Williams did

not change his mind and decide that he would have testified in the aid of his

brother's defense until long after the trial was over. The evidence from the post-

trial evidentiary hearing, one year after the trial, demonstrates that prior to his

change of heart in 2010, if called as a witness, he would not have testified at all

regarding the gun, the car, or Petitioner and the gun. The evidence shows that

the jury would have never heard from Mario Williams on these topics because he

would have asserted his Fifth Amendment privilege at trial, as he did in 2006, a

decision not based on Harris's actions. Therefore, his testimony at trial, in 2005,

would not have been helpful to Petitioner.

Additionally, as discussed with regard to Petitioner's actual innocence

argument, the evidence at trial strongly established that the gun belonged to the

Petitioner.

In sum, Petitioner fails to show a reasonable probability that, but for

Harris's failure to investigate or call Mario Williams at trial, the outcome would

have been different.

### 3. Investigation of Travis Mitchell

Williams argues that Harris was ineffective for failing to interview or call

Travis Mitchell as a witness. He claims that Mitchell witnessed a thorough

search of Petitioner at the time of his arrest on January 17, 2004, which would

prove that the drugs supposedly found in the coin pocket in Williams' pants were later planted on Williams by the police.

Williams raised the issue of Harris's failure to interview or call Travis Mitchell on his direct appeal.  The Eighth Circuit upheld the Court's conclusion that Harris's actions were reasonable and, also, that Williams failed to demonstrate prejudice.  Williams, 562 F.3d at 942.  "Issues raised and decided on direct appeal cannot ordinarily be relitigated in a collateral proceeding based on 28 U.S.C. § 2255."  Wiley, 245 F.3d at 752.  As previously discussed, Petitioner's actual innocence claim fails.  Therefore, this argument is foreclosed.  Moreover, even if the Court were to consider this argument, Petitioner's claim cannot pass the prejudice prong of the Strickland test.

### a)       Harris' Disciplinary Action

As new evidence, Williams points to the Office of Lawyers Professional Responsibility's Petition for Disciplinary Action against Harris, which states that, although Williams' family gave Harris the funds to hire investigator Robinson to obtain a statement from Travis Mitchell, Harris applied the funds to the retainer, did not hire Robinson, and did not get the statement from Mitchell.  (Petition for Disciplinary Action ¶ 21-22.)  Harris further admitted that Travis Mitchell did

witness Williams' arrest and that Williams and Harris discussed the need to get a statement from Mitchell.  (Id. ¶ 20.)

Harris's admissions demonstrate a serious ethical breach.  However, it does not change the Court's post-trial motions analysis concluding that Williams cannot show prejudice.

### b)   Prejudice

Williams asserts that he was prejudiced by Harris's failure to investigate and call Mitchell because Mitchell's testimony had the potential to bolster the defense's argument that the drugs were planted on Williams.  He points to an April 26, 2006, memorandum from Trebil to Williams' counsel that purports to recount the contents of a telephone conversation Trebil had with a Mitchell during a break in the April 25, 2006, post-trial motions hearing.  (Williams' Appendix 6.)  This hearsay evidence is the same evidence Williams presented during that post-trial motions hearing.  See Williams, 2007 WL 518856, at *13.

The Court previously found that Petitioner failed to show prejudice.  The Eighth Circuit affirmed because "Williams also failed to call Mitchell as a witness at the post-trial evidentiary hearing to establish what Mitchell's testimony at trial might have been."  Williams, 562 F.3d at 942.  Today, the Court has evidence that

Harris breached her ethical duties by misappropriating the funds given to her to investigate Mitchell.  However, it still does not have reliable evidence of what Mitchell's testimony would have been or that the verdict would have been different if it had heard his testimony.  See Williams, 2007 WL 518856, at *13-*14.

Also, as the Court explained with regard to the actual innocence discussion, even if the Court fully credits Mitchell's statement as recounted in the Trebil Report, it simply recounts that Mitchell saw Williams being thoroughly searched during his arrest; it does not state whether or not he saw police specifically search Petitioner's coin pocket.  Additionally, Mitchell's testimony would have been readily impeached by his previous statement given to Special Agent Nygren.  So, while Mitchell's testimony would have been somewhat helpful to Williams, in light of the minimal value of Mitchell's testimony and the other evidence presented at trial, Williams cannot show a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.  Overall, Williams has still failed to satisfy the prejudice prong of the Strickland test with regard to the investigation of Mitchell.

### 4.     Investigation of Nunziata Williams

Williams argues that the Government relied on Nunziata Williams'

testimony to establish that he conspired to violate drug laws and to establish that

he possessed a firearm in furtherance of this drug crime.  He claims that post-

trial investigation has revealed facts regarding Nunziata Williams' background

that could have been used to impeach her testimony at trial.  He concludes that

Harris was ineffective for failing to investigate Nunziata Williams' background.

### a)     Procedural Bar

Williams did not raise the issue of Harris's failure to investigate Nunziata

Williams' background in his direct appeal.  Williams claims that, long before

trial, Harris told him that she suspected that Nunziata Williams was cooperating

with the Government.  Even so, she failed to investigate Nunziata Williams'

background.  After the trial, Williams hired Warren Robinson and Peart &

Associates to investigate Nunziata Williams' background.  As recounted with

regard to the actual innocence discussion, these investigators raised questions

regarding her identification and immigration status.  Williams asserts that this

information would have undermined Nunziata William's credibility and helped

impeach her, such that a reasonable juror would not have believed her

testimony. He asserts that all of this information would have been available before trial if Harris had pursued a reasonable investigation.

### b) Prejudice

The Court discussed the evidence regarding Nunziata Williams' identity in its discussion of Petitioner's actual innocence argument. To reiterate, considering all of the evidence provided by Petitioner regarding Nunziata Williams' social security number, it is possible that she has used an incorrect social security number, but there is no reliable evidence that she did so, let alone, did so dishonestly. Williams has presented no evidence that Nunziata Williams is improperly receiving benefits, beyond his own argument. The investigators' preliminary reports regarding Nunziata Williams' immigration status and original name raise questions about her immigration status, but there is no material evidence of dishonesty. Overall, even if the jury had considered this equivocal evidence now offered by Petitioner to weaken Nunziata Williams' credibility along with all of the other evidence in the case, including the fact that her testimony was corroborated by the physical evidence, such as the bullet casing found in the Riviera, Petitioner cannot show a reasonable probability that the result of the trial would have been different.

### 5.      Whether Harris Failed to Convey a Plea Offer

Williams asserts that Harris failed to convey a plea offer to him.

To prevail on an ineffective assistance of counsel claim based on the failure to convey a plea offer, Williams must show that Harris's performance was not objectively reasonable and that her performance prejudiced his defense.  To establish prejudice, he must show that he would have accepted the plea, if Harris had communicated it to him and properly advised him, and would and could have satisfied the offer's requirements.  See Engelen v. United States, 68 F.3d 238, 241 (8th Cir. 1995); McNeil v. United States, 63 Fed. Appx. 963, at 964-65 (8th Cir. 2003).  When the record shows that the petitioner steadfastly maintained his innocence, the petitioner fails to establish a reasonable probability that he would have acknowledged his guilt before trial.  Chesney v. United States, 367 F.3d 1055, 1060 (8th Cir. 2004); McNeil, 63 Fed. Appx. at 965.

Williams asserts, during the appeal process, on August 26, 2009, Menendez forwarded Williams a plea agreement that had been formally offered by the Government on December 9, 2004.  The Government offered to dismiss Counts 2 and 3, if Williams pled guilty to Count 1, possession with intent to distribute the crack cocaine found in his pocket.  The Guideline range for Count 1 would be 151-188 months.  (Williams Appendix 9.)  Williams also points to a copy of a

page from the Guidelines Manual on which Harris had written that Williams

would face 151-181 months with "no cooperation" and 6 years "if cooperates."

(Williams Appendix 11.)

Williams further points out that, during a telephone conference between

Harris and Williams, she conveyed the existence of the plea offer to Williams.

(Williams Appendix 10.)  Harris then visited Williams in jail.  She failed to bring

the plea offer with her.  (Williams Appendix 12, Williams Aff. ¶ 4.)  Williams

asserts that Harris told him that the Government was offering a plea of 151-181

months if he cooperated.  (Id. ¶ 5.)  He claims that she did not tell him that the

deal was available if he pled guilty to Count 1 without cooperation, that, with

cooperation, his sentence would be no greater than 6 years, or that the plea offer

included an agreement from the Government to not pursue any further

prosecution of Williams for criminal activities of which the Government was, at

that time, aware.  (Id. ¶¶ 6-8.)

Williams asserts that he would have accepted the 151-181 month offer,

and, in fact, he also would have cooperated with the Government in order to take

the 6-year plea. (Williams Aff. ¶¶ 11-12.)  Williams emphasizes that he is not

admitting any guilt and maintains his innocence but would have accepted the

offer anyway in order to minimize his sentencing exposure.  (Id.; Mem. in Support of § 2255 at 19-20.)

Williams has steadfastly maintained his innocence of all charges from the beginning of this case until the present day.  In connection with Williams' Motion for Acquittal Notwithstanding the Verdict, he stated that he had informed Harris that he would not accept a plea and told her not to inform him of a plea offer.  Williams, 2007 WL 518856, at *5.  In his memorandum in support of this petition, Williams continues to maintain his innocence.  Williams' after-the-fact assertion in his affidavit that he would have been willing to accept a plea, although he still claims that he is not guilty, in order to limit his sentence is not the type of "objective evidence required to establish a reasonable probability that he would have accepted the plea agreement absent his counsel's allegedly deficient performance."  Moses v. United States, No. 97-3938, 1999 WL 195675, at *1 (8th Cir. Apr. 2, 1999).  To be entitled to an evidentiary hearing and avoid dismissal of his habeas petition, a petition "must present some credible, non-conclusory evidence that he would have pled guilty had he been properly advised."  Engelen, 68 F.3d at 241.  Williams has failed to do so.  Therefore, his claim based on the failure to convey the plea offer fails.

6.    **Whether There Was a Complete Breakdown in Communication**

Williams argues that there was a complete breakdown in communication between Williams and Harris.  Williams raised the issue of whether there was a complete breakdown in communication between Harris and Williams on his direct appeal.

Williams claims that he now has new evidence.  Specifically, in her disciplinary proceeding, Harris admitted that she wrote Williams a letter on February 16, 2005, which stated: "It looks like you've been indicted again. Enclosed please find a copy of the indictment.  You can call me when I get back from vacation on Wednesday, February 22, 2005."  (Williams Aff. ¶ 25.)  She also admitted that, although Williams attempted to call her after received the February 16 letter, she did not return his calls and he was not able to discuss the second superseding indictment with her before his trial on March 10, 2005.  (Id. ¶ 26.)

However, evidence of a lack of communication between Harris and Williams from February 16, 2005, through March 10, 2005, was before this Court on the post-trial motions and the Court of Appeals on direct appeal when each made its decision declining to find a breakdown in communication.  See

<u>Williams</u>, 2007 WL 518856, at *5 ("Williams is also correct that the visitor and call logs show no contact after February 15 and before March 21, 2005.  However, Harris did meet Williams in person . . . for arraignment, on February 28, 2005, and during trial, which started on March 10, 2005.").   Williams cannot use a § 2255 petition to collaterally attack an issue that was already resolved on direct appeal.  <u>See, e.g.</u>, <u>English v. United States</u>, 998 F.2d 609, 612-13 (8th Cir. 1993).

The Court further notes:

Additionally, on March 10, during the conflict of interest hearing, Williams explicitly informed the Court that he wished to continue with Harris's representation.  Williams' stated desire to continue with Harris's representation is inconsistent with his claim that her pretrial actions led to a complete breakdown in communication.

<u>Williams</u>, 2007 WL 518856, at *6.  Finally, the Court already addressed the validity of Williams' decision to proceed pro se in the post-trial motions, and that decision was affirmed on direct appeal.   <u>See</u> <u>Williams</u>, 562 F.3d at 942.

### D.    Williams' Claim of Prosecutorial Misconduct

Williams asserts that the Government committed prosecutorial misconduct by failing to disclose Nunziata Williams' immigration status and the allegation that she had used a false social security number and by failing to turn over

audiotapes of the first and second January 17, 2004, Mirandized interviews of
Williams.

Williams did not raise either of these issues before trial, after trial, or on
direct appeal.  The failure to raise an issue on direct appeal constitutes a
procedural default, barring the issue from a § 2255 motion, unless the petitioner
can show both a cause that excuses the default and actual prejudice.  Matthews,
114 F.3d at 113.  First, the Court considers whether there is evidence of
prosecutorial misconduct.

Under Brady, "the suppression by the prosecution of evidence favorable to
an accused upon request violates due process where the evidence is material
either to guilt or to punishment, irrespective of the good faith or bad faith of the
prosecution." Banks v. Dretke, 540 U.S. 668, 691 (2004) (citation omitted).  "[T]he
three components or essential elements of a Brady prosecutorial misconduct
claim [are]: The evidence at issue must be favorable to the accused, either
because it is exculpatory, or because it is impeaching; that evidence must have
been suppressed by the State, either willfully or inadvertently; and prejudice
must have ensued." Id. (citation omitted).  The defendant bears the burden of

establishing that the Government suppressed the evidence.  <u>United States v. Van Brocklin</u>, 115 F.3d 587, 594 (8th Cir. 1997).

### 1.    Allegations Regarding Nunziata Williams

Williams asserts that the Government committed <u>Brady</u> violations by failing to disclose Nunziata Williams' immigration status and her use of another person's social security number.

### a)    The Government's Awareness of the Allegedly Suppressed Information

The Government asserts that it has never been aware that Nunziata Williams had any immigration issues or used a false social security number.  It argues that Williams and Nunziata Williams had an intimate relationship and lived together so, if anyone would have been aware of issues with her citizenship or the illegal use of a social security number, it would have been Williams. Williams had the opportunity to cross examine Nunziata Williams at trial and could have inquired about those issues.  He also could have raised the issues during post-trial evidentiary hearings and motions, but he did not.

Williams points to an investigative report from Investigator Robinson concluding that Nunziata Williams told Robinson that she was a Liberian citizen

with U.S. permanent resident status and that the FBI was "well aware" of her

identity and immigration status.  (Robinson Report at 2; Robinson Aff. ¶ 13.)

This evidence merely provides Nunziata Williams' opinion that the FBI was

aware that she had U.S. permanent resident status.  It does not provide evidence

that the Government was aware of her alleged issues with her Alien Number,

social security number, or name.

Williams does not show that the evidence regarding Nunziata Williams

was suppressed by the Government, even inadvertently.  He does not offer any

evidence that the Government was ever in possession or aware of this evidence.

Therefore, his <u>Brady</u> claim fails.

Moreover, Williams cannot show prejudice for failure to raise this issue on

appeal.  As previously discussed with regard to Williams' actual innocence

argument and his ineffective assistance of counsel claim related to the Nunziata

Williams investigation, the evidence regarding her background and immigration

status is equivocal, and he cannot show that, if it had been revealed, there is a

reasonable probability that the result of the trial would have been different.

## 2.  Allegations Regarding Mirandized Interviews

Williams asserts that the Government committed <u>Brady</u> violations by

failing to turn over audiotapes of two in-custody Mirandized interviews of

Williams that took place on January 17, 2004 at the First Precinct and at the

Hennepin County Jail.  Williams asserts that the officers conducting the second

interview, at the Hennepin County Jail, never questioned Petitioner regarding

possession of crack cocaine.  Williams asserts that the audiotapes of these

interviews would have helped to prove that the drugs related to Count Two

were planted on him by the police officers because it was strange that he was not

questioned about the drugs during the interviews.

Petitioner further claims that the audiotape of the First Precinct interview

would have impeached the testimony of Officer Lazarchic who participated in

the interview, yet testified during trial that he had no further contact with

Petitioner after placing him in a holding cell at the First Precinct.  (Trial Tr. 232.)

However, Petitioner points to no evidence that there exists an audiotape of an

interview at the First Precinct.

The Government consistently represented to the Court that there was only

one recorded interview, the January 17, 2004, interview that occurred at the

Hennepin County Jail.  (<u>See</u> Aug. 30, 2004 Tr. 38-40, 46-47; Feb. 7, 2005 Tr. 17.)

42

Williams claims that the Government never turned over this audiotape. However, at the August 30, 2004, pretrial hearing, the Government submitted that audiotape as an exhibit to the Court and promised to provide another copy of the tape to defense counsel that day.  (See Aug. 30, 2004 Tr. 38-40.)  At the February 7, 2005, pretrial hearing, the Court inquired about confessions or statements, the Government again reiterated that there was the one statement from January 17 discussed at the previous motions hearing, and defense counsel responded, "That's our understanding, Judge."  (Feb. 7, 2005 Tr. 17.)  This record indicates that the Government did not ever hide the existence of the audiotape of the Hennepin County Jail interview and that, in fact, the Government did turn over the recording of the Hennepin County Jail interview to the defense. Williams presents no credible evidence that the tape was not turned over.

     **E.**    **Williams' Claim of Ineffective Assistance of Counsel on Appeal**

"Ineffective assistance of appellate counsel may constitute cause and prejudice to overcome a procedural default."  Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005) (citation omitted).

### 1.      Decision to Raise the Ineffective Assistance of Counsel Claim on Direct Appeal

Williams asserts that Menendez was ineffective for raising the ineffective assistance of counsel claim regarding Harris on direct appeal.  Although, generally, ineffective assistance of counsel claims should be left for post-conviction proceedings, they are routinely reviewed on direct appeal when "the record is fully developed because the district court held an evidentiary hearing at which it allowed [the defendant] to present evidence regarding the alleged ineffective assistance of counsel."  United States v. Orr, 636 F.3d 944, 950 (8th Cir. 2011).

In this case, as the Eighth Circuit acknowledged, there was a fully developed record on the ineffective assistance of counsel issue on direct appeal. Williams, 562 F.3d at 941.  This Court held an extensive post-trial motions hearing on April 25, 2006, addressing the ineffective assistance of counsel claims. The hearing was held after a long delay, allowing Defendant more than adequate time for investigation and preparation.  Given the fully developed record on this issue, it was reasonable for Menendez to raise the ineffective assistance of counsel claims on direct appeal.

2.   **Failure to Raise Prosecutorial Misconduct Allegations on Appeal**

Williams also asserts that Menendez was ineffective for failing to raise the prosecutorial misconduct claims on direct appeal.  Because, as the Court has already discussed, Williams fails to show that prosecutorial conduct occurred, he also fails to show that Menendez's performance was deficient in failing to raise the prosecutorial misconduct claims.  Nor does Williams show prejudice.

F.   **Certificate of Appealability**

With regard to the Court's procedural rulings, the Court concludes that no "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right;" nor would "jurists of reason . . . find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  With regard to the Court's decisions on the merits, it concludes that no "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Id.  Therefore, the Court denies a Certificate of Appealability in this case.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

45

1.     Larry Darnell Williams' Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [Docket No. 214] is **DENIED**.

2.     The Court denies a Certificate of Appealability is this case.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   January 8, 2012                    s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court